RAISBECK, Appellant, vs. ANTHONY and another, Respondents.

*December 4, 1888 — March 12, 1889.*

*Mines and mining: License: Limitation of rights: New discovery.*

1. By the terms of a mining license a range of mineral was not to be worked beyond a point 300 yards west of a certain fence. When it had been worked for nearly half of the distance the crevice

pinched out and became barred by a solid wall of rock. A shaft was then sunk about forty-five feet ahead, and by drifting from it a few rods in the same direction a crevice was struck in which mineral was again found. The crevice, before it reached the barrier, and after the barrier was passed, was of the same general character, and there was no change in its general direction or in the rock or the mineral found. *Held*, that the crevice west of the barrier was a continuation of the crevice or range east of it, and that there was no new discovery such as would give rights not limited by the terms of the original license.

2. The limitation on the right to work the range having been created by contract, the discoverers of the range and those claiming under them could be relieved therefrom only by contract; and the evidence (showing, among other things, that the land-owner told one of the owners of the range to go where he pleased upon the range and work it as he pleased) is *held* insufficient to show that the limitation was ever abrogated.

APPEAL from the Circuit Court for *La Fayette* County.

This is an action in equity brought by the plaintiff, who is the owner in fee of certain lands in which is a range of mineral, against the defendants, who claim under the discoverers of such range to be the owners thereof. A trial of the action resulted in a judgment for the defendants dismissing the complaint. The plaintiff appeals from such judgment.

The facts in the case, and the grounds upon which the judgment rests, are fully and clearly stated in the opinion of the circuit judge. Although somewhat lengthy, the case can best be stated by inserting here such opinion in full. It is as follows:

"This action was brought to perpetually restrain the defendants from working further ahead a certain range of mineral. This range is on the west half of the southeast quarter and the east half of the southwest quarter of section 21, town 2, range 1 east, in said county of La Fayette. When said range was discovered said land was owned by Robert Raisbeck, father of the plaintiff, and is now

owned by the plaintiff as his devisee. Robert Raisbeck died in 1886. The plaintiff claims that the limit of the defendants to work this range is a point 300 yards west of a certain stone fence that bounds the public highway which passes over said land. The range has been worked to that point. The defendants were notified to not work beyond it, and as they persisted in doing so this action was commenced to perpetually restrain them and for damages, and a temporary injunction was granted restraining them from working the range beyond that point pending this action. The range bears zinc ore, and in that consists its principal value.

"John Anthony, Sr., under whom the defendants claim as heir and widow, and one Wallace Dixon, discovered this range or the crevice that led to it about the year 1872. Wallace Dixon died in the spring of 1887, and John Anthony, Sr., died June 19, 1886. After the range was struck it was worked for three or four years by John Anthony, Sr., and Wallace Dixon, the discoverers, alone. Afterwards the plaintiff and his father became interested in the range as part owners, and it is undisputed that in the year 1878 the range was owned by John Anthony, Sr., one of the discoverers, Robert Raisbeck, the owner of the land, and his son, this plaintiff. About the last-mentioned date Robert Raisbeck sold his interest in the range to John Dixon. This plaintiff, John Anthony, Sr., and John Dixon, owned and worked the range until the year 1881, when the latter sold his interest therein to his partners, and until the death of John Anthony, Sr., the range was owned by him and the plaintiff. After John Anthony, Sr.'s death, the range was, as stated above, owned by the defendant *John Anthony* as the heir of his father, subject to the interest therein of his mother, the defendant *Louisa Anthony*, as widow, and this plaintiff, and up to the time the injunction in this action was served it was worked by them and their

servants. Since the range was discovered the rent upon all ores taken therefrom has been regularly paid to the owner of the fee.

"There is, as above stated, no question under the testimony that the plaintiff owned one half of the range as far as it had been worked, and the defendants the other half. The matter in dispute is whether the defendants have any right to work the range beyond the point to which the work upon it had been prosecuted when the injunction was served. The contention of the plaintiff is that his father, the land-owner, when he gave John Anthony, Sr., and Wallace Dixon the right to search for ores in his land, originally confined their right to follow westward any range or valuable discovery they might make to a certain stone fence that bounded a field to the west of the place where they began to mine, and that when, in following the range they discovered westerly, they reached this fence, they were only permitted to follow this range into said field under an agreement that their right to work it should be limited in that direction by a point 300 yards west of said fence. As the range has been worked to that point, there is no doubt that, if the discoverers were originally limited by Raisbeck, deceased, in their right to follow the range on his land, by said fence, and by subsequent agreement they were permitted to follow it 300 yards only beyond the fence, the defendants have no further right in it, and that the part of the range beyond that limit belongs solely to the plaintiff, the owner of the fee, unless since such agreement new rights have arisen. The range, at the time the injunction was served, was yielding valuable zinc ore, and seemed likely to continue to do so.

"The testimony is very meager upon the question of whether at the time John Anthony, Sr., and Wallace Dixon began to mine, about the year 1872, they were limited by Robert Raisbeck to follow any range they might discover.

The license or lease under which they began to mine was verbal, as in those days was usually the case. All of the parties to it are dead, and all of the testimony bearing upon the rights the two miners originally possessed is circumstantial, hearsay, or the recollection of witnesses of statements of the parties in interest in casual conversations had years ago. There is testimony tending to show that when, in their progress in working the range, the discoverers reached the fence, they, for a short time, did not prosecute the work onward. Whether because they were originally limited, or because, as one witness who worked the mine says, the range ' pitched down ' at that point into the water, and it became necessary to stop work upon it and bring up a drain to unwater it, it would be difficult for me, from the testimony, to say positively; but my impression is that it was not expected at the time of the license to mine, that a range would be discovered that would run westerly beyond said fence, and that none of the parties had in contemplation such a discovery when the mining began. I am confirmed in this impression by the facts shown by the testimony that, although at that time considerable mining had been done on the land of the licensor east of the fence, some of it within the yard surrounding his house, no range, so far as the testimony shows, had been discovered that ran into said field on the west. It seems to me probable that when the boundary of the field was reached, then arose a question of right of the discoverers to proceed, and that they did not prosecute the work until an understanding was arrived at. What that understanding or agreement was it is impossible, from the testimony, to definitely state. It was oral. It seems to have been the intention to place it in writing. A writing was drawn up, but it was never executed. What the contents of it was no one can state. I think, however, from all the testimony, it is a fair conclusion that the discoverers proceeded with their work

in the field upon the understanding that they were limited, in the distance they might follow the range into the field, to a point 300 yards west of the fence.   As to whether that limit was absolute or contingent, I cannot, with satisfaction to myself, certainly determine.   I base the conclusion that that was understood to be a limit upon the testimony of various witnesses as to what they had heard the parties in interest say.   I must say, however, that I was never more impressed with the principle that testimony of this kind is inherently weak than I was upon this trial; for although I deduced from it that it was agreed that there should be a limit, I could not but feel that the recollection of some of the witnesses could not be much relied upon. Take the witness Davidson, for instance,— the most positive witness upon this question that the plaintiff produced. No one who heard him could believe that much of what he testified regarding conversations took place as he detailed it, and I say this without any purpose to charge any wilful misrepresentation to him, but only to show the weakness, as testimony, of the statements of a witness of what he recollects of conversations had years before, in a casual manner, upon a subject in which he had no interest.

" The reason why a limit was named by the land-owner, Raisbeck, as a condition of permitting the discoverers to follow the range, is not to be determined from the testimony.   There was nothing artificial or natural in the field which would indicate a reason why work should stop at the end of 300 yards.   For aught there was in the field itself, the limit might as well have been 200 yards, or 400 yards, or its western boundary.   It was claimed upon the argument that the limit, if there was one, was contingent upon whether the mine proved productive enough to yield a rent to the land-owner that would make it desirable to him to have mining continued, rather than to have it· stopped and the surface of the ground upon the line of the

range remain undisturbed.   There is some testimony to support this claim, and in itself it does not seem to one raised in the mining region unreasonable, for it is a matter of common knowledge among those acquainted with the lead-mine region that farmers, who are willing to have an arable field or pasture dug up if ore is raised in quantities that will yield them a fair rent, will not permit their land to be dug over by miners who are endeavoring, by prospecting, to discover ores in paying quantity, upon the line even of a known crevice or range.   If the limit was not thus contingent, the only plausible reason why a limit was stated is that Raisbeck, the land-owner, was willing, as a matter of favor, to give the discoverers the right to work the range that far because they had discovered it, and that when that limit was reached, no matter how valuable the ore might be or appear to be, beyond it he would then, as owner of the fee, exclude them from the range.

"Whatever might have been the exact agreement, the work was continued westwardly in the field.   In the year 1878, the range, to use the miner's phrase, began to 'pinch out;' that is, the walls of the crevice came nearer together, and the ore sheet became thinner, and ceased to produce ore enough to pay for the cost and labor of taking it out. The owners of the range, as partners, at that time were, as I have stated, John Anthony, Sr., one of the discoverers, Robert Raisbeck, the land-owner, and this plaintiff.  Robert Raisbeck at that time desired John Dixon, an old and experienced miner, to come and work his interest in the mine, and told him that his son, this plaintiff, had not much experience as a miner, and that if he (Dixon) would work for him (Robert Raisbeck) on the range at $1.25 per day, which was less than regular miner's wages, he would likely, after a time, give him his interest in the range.   Dixon accepted the offer, and went to work.   After working for a time, and the mine appearing no better, Robert Raisbeck told

him that he might have his interest if he would pay him
the expense he had been to for powder, etc.   To this Dixon
agreed, and he became the owner of Robert Raisbeck's in-
terest.   At that time the range had almost ceased to yield
ore.   Dixon went into the mine to work in the hope that
by working ahead paying ore would be discovered.   He
testifies that Robert Raisbeck gave him his interest in the
range, naming no limit, and that he knew of no limit, and
that it was his understanding that if he and his partners
could strike paying ore that they might follow it indefi-
nitely in Raisbeck's field.   It is certain from the testimony
that Robert Raisbeck did not want work upon the range to
stop, but, on the contrary, that he was anxious in the inter-
ests of his son *William*, as well as himself as land-owner,
that efforts should be made to find upon it valuable ores.
After Dixon became the owner, the range was followed
about one hundred feet, some zinc ore being taken out, when
it became barred up; that is, a solid wall of rock was struck
against, at which the crevice they were following abruptly
ended, and the yield of ore stopped.   I have no question
that Robert Raisbeck knew this, and there is no proof that
he desired, much less expressed a desire, that the work
within the field should stop.   A surveyor was then em-
ployed to determine, as near as possible, a point where a
shaft should be sunk to strike the lost crevice, if it extended
beyond the bar.   A point was designated forty-five feet
ahead of the place where the work had stopped.   A shaft
was sunk there.   It did not strike the crevice, but from it
a crevice was found by drifting, but it contained no ore at
the place the drift struck it.   They drifted ahead, and at
length, after having worked for several months without
obtaining paying ore, and after John Anthony, Sr., and
this plaintiff had become so disheartened that they pro-
posed to abandon the range, and would have done so but
for Dixon's persistence, ore was again found in paying

quantities, and that ore was followed until work was stopped by the preliminary injunction. John Dixon sold his one-third interest in the mine, as stated heretofore, about 1881, and received for it $600. The testimony of John Dixon, as above substantially given, was not contradicted.

"I find the facts above stated to be true. From them I can but conclude that, whatever talk there was of a limit when the work in the field began, there was no purpose upon the part of Robert Raisbeck to limit the work upon the range when he requested John Dixon to come and work upon it, and that Dixon and John Anthony, Sr., and this plaintiff, who together worked the range as owners of it, did not understand from the time Dixon became an owner that their rights were limited by a point 300 yards from the fence. Nearly half of this distance had been worked when they struck the bar, and it seems to me improbable that they would after that work hard for months, without remuneration, to develop a range that had ceased to yield ore, if they believed that they could not follow beyond a point not far in advance the ore their persistence might discover. The land-owner must have understood that they were not then working under a belief that they were limited, and I think it a fair conclusion that he had abandoned the intention of insisting upon a limit. It would be altogether unlikely, in view of the hard and unpaid work that was being done and that he must have known of, that he could have had the purpose of insisting upon a limit as to his son, and, under the circumstances, it would have been manifestly unfair to have applied a harsher restriction upon the partners of the son than to him.

"I find that the crevice they struck beyond the bar was practically a new crevice, and that the ore they finally found in it was in fact a new and valuable discovery; that the land-owner, Robert Raisbeck, knew that after they struck the bar they were working to find a new crevice;

that he did not object; that it was with his sanction and license that they prosecuted the work; and that no limit was imposed upon them beyond which, in said field, they should not work any crevice or valuable discovery of ore they might strike.

" As final conclusions of fact I find that the plaintiff and the defendants are the owners of the range which was being worked by them upon the lands of the plaintiff at the time this action was commenced; that the plaintiff owns the one-half of said range and the defendant *John Anthony* owns the other half thereof, as the heir of his father, John Anthony, Sr., subject to the rights in said half of his co-defendant, *Louisa Anthony,* as the widow of John Anthony, Sr.; that the defendants, as the owners of one half of said range, and as tenants in common thereof with the plaintiff, were in the lawful possession of said range at the same time this action was commenced, and that they had the right, as such tenants, to work thereon, subject to the payment of the ground rent to the plaintiff as landlord; that the right of the defendants to work said range is not limited by a point 300 yards west of said fence.

" And as conclusions of law that judgment be entered, dismissing the plaintiff's complaint upon the merits with costs, and dissolving the preliminary injunction that has been granted in this action."

For the appellant there was a brief by *Orton & Osborn,* and oral argument by *P. A. Orton.*

For the respondents there was a brief by *Bushnell & Watkins,* and oral argument by *A. R. Bushnell.*

The following opinion was filed December 22, 1888:

LYON, J. We think the testimony is sufficient to sustain the finding of fact that John Anthony, Sr., and Wallace Dixon discovered the range of mineral in controversy, on the land of Robert Raisbeck, about the year 1872. We are

also of the opinion that it is sufficiently alleged in the answer, by necessary implication at least, and proved, that Anthony and Dixon entered upon and prospected the lands in which the range of mineral was found by the consent and license of Robert Raisbeck, the owner thereof. This appears from the allegations that they made such discovery of the range and paid the rent for the mineral obtained therefrom to such owner, who accepted the same, and from the proofs of those facts and the presumptions fairly deducible from the evidence that they so entered peaceably and with the knowledge of the owner, who made no objection thereto.

This brings the case within the provisions of ch. 260, Laws of 1860, as amended by ch. 117, Laws of 1872, being sec. 1647, R. S., except in so far as the statutory rights of the discoverers may have been restricted by special contract between Anthony and Dixon and the owner of the land. If there was no such restriction, the discovery of the range or the crevice which contained the mineral rendered the license irrevocable by the land-owner, and vested in the discoverers the title to the ores in the range or crevice on the lands of the licensor, subject only to the rent due him. If such title so vested in the discoverers, it necessarily results that neither a sale of the land by the licensor or of the range by the licensees, nor the death of either or all parties, would operate to revoke such license. If the licensor limited the right of the discoverers to work the range or crevice only to a certain point, such limitation is binding, and the statute gives the discoverers no right therein beyond the point of limitation.

The statute above mentioned is as follows: " Sec. 1647. Where there is no contract between the parties, or terms established by the landlord to the contrary, the following rules and regulations shall be applied to mining contracts and leases for the digging of ores or minerals, viz.: (1) No

license or lease, verbal or written, made to a miner, shall be revocable by the maker thereof after a valuable discovery or prospect has been struck, unless the miner shall forfeit his right by negligence, such as establishes a forfeiture according to mining usages.   (2) The discovery of a crevice or range containing ores or minerals shall entitle the discoverer to the ores or minerals pertaining thereto, subject to the rent due his landlord, before as well as after the ores or minerals are separated from the freehold; but such miner shall not be entitled to recover any ores or minerals, or the value thereof, from the person digging on his range in good faith, and known to be mining thereon, until he shall have given notice of his claim; and he shall be entitled to the ores or minerals dug after such notice.   (3) Usages and customs among miners may be proved in explanation of mining contracts to the same extent as usage may be proved in other branches of business."

The contention of the plaintiff is that Anthony and Dixon were limited by their agreement with Robert Raisbeck to a point 300 yards west of the stone fence, beyond which point their license gave them no authority to mine, while that of the defendants is that there was no limitation upon their right to work the range or crevice entirely across Raisbeck's land, if the same extended across it.

The circuit judge found that when the license was given it was not in the contemplation of the parties that the range extended west beyond the stone fence; that when the fence was reached there probably arose a question between them as to the right of the licensees to proceed further; and that the work was suspended, and negotiations were had which resulted in an agreement limiting the right of the latter to mine the range to a point 300 yards west of the stone fence, and no farther.   A careful perusal of the testimony satisfies us that these facts were correctly found. The judge commented somewhat upon the intrinsic weak-

ness of the testimony upon which the above findings rest, and doubtless there is some force in his observations. But it must be remembered that the transactions rested in parol, and the original parties thereto had all deceased before the cause of action arose; hence the testimony was the best that could be obtained. In our view it quite satisfactorily establishes the facts thus found. The judge also expresses some doubt as to whether the limitation was not contingent upon the failure to find mineral in paying quantities beyond the 300-yards point to the westward. Without stating the testimony bearing upon the doubt thus suggested, or going into any discussion of it, it must suffice to say we think the evidence is that the limitation was absolute. There having been an uncertainty as to the extent of the original license, and probably a controversy between the parties in respect thereto, the 300-yards limit settled upon by them when the stone fence was reached removed such uncertainty and terminated the controversy, and the limitation thus agreed upon became, by relation, a part of the original contract or license, and settled conclusively what were the terms thereof.

Were the foregoing facts all there is of the case, there can be no doubt the plaintiff would be entitled to the relief he demands; for, standing alone, they demonstrate that the defendants have no rights in the range west of the 300-yards point, and inasmuch as they persist in working the range beyond that point the plaintiff would be entitled to a perpetual injunction restraining them from so doing. But the circuit judge made two deductions from the testimony, upon which he based the judgment for the defendants. These are (1) that after the crevice had been worked to the point where it pinched out, and Robert Raisbeck had employed John Dixon to prospect ahead for the purpose of again finding it, and after Dixon had become a part owner of the range, it was the understanding of all the parties interested

that the limitation to the point 300 yards west of the stone fence was no longer binding upon the owners of the range, but that they were at liberty to work the crevice across the lands of Robert Raisbeck west of that point; and (2) that the crevice discovered by John Dixon beyond the point where the original crevice pinched out was a new one, and the ore which Dixon and his associates found therein was a new and valuable discovery, made under a license from the land-owner which contained no limitation of their right to mine the crevice entirely across his land, should it extend so far. Whether the above deductions were correctly made and, if so, their effect, will now be considered.

1. The limitation in question was created by contract, and the discoverers of the range and those claiming under them could be relieved therefrom only by contract. The learned circuit judge scarcely finds that any contract removing the limitation was ever made. He speaks of the purpose of Robert Raisbeck and the understanding of the owners of the range; also of the improbability that such owners would search for the crevice after the bar had been struck, and perform the labor they did in finding the mineral west of the bar, had they supposed they were restricted by the limitation. But he does not say that the parties agreed that the limitation should be removed. We fail to find any sufficient evidence in the record to prove that any such contract was made. The owners of the range at the time were John Anthony, Sr., John Dixon, and the plaintiff. John Anthony, Sr., was a party to the contract of limitation, and must have known that it was made. John Dixon knew, also, that there was a limitation. He purchased his interest of Robert Raisbeck, and testified on the trial that before he so purchased Raisbeck told him there was a limit, but not where it was. Knowing the existence of a limitation, they could only avoid it by a contract with Robert Raisbeck rescinding it. They obtained no such

contract from him. True, John Dixon testified that Robert Raisbeck told him to go where he pleased on the range and work it as he pleased; but this was not sufficient to relieve the parties from the limitation which they knew they were subject to. It must be held that the evidence fails to show that the limitation in question was ever abrogated.

2. It only remains to consider the question, Was the crevice which John Dixon found west of the point where the original crevice pinched out, a distinct crevice, and the discovery of the ore therein a new discovery; or was it a continuation of the original crevice and vein of mineral therein? It was not a new crevice and a new discovery merely because the original crevice ceased to yield ore and pinched out. This may have occurred, and still the crevice or vein be the same throughout. In *Iron Silver Mining Co. v. Cheesman*, 116 U. S. 529, this subject was considered, and the following definition of a lode or vein (which we understand to be the equivalent of a range or crevice, as those terms are employed in this case) is given: "In general it may be said that a lode or vein is a body of mineral, or mineral body of rock, with defined boundaries, in the general mass of the mountain." This is the definition given by Judge HALLETT, in *Stevens v. Williams*, 1 McCrary, 480, 488. Speaking of obstructions to a vein or lode, Mr. Justice MILLER, who delivered the opinion of the court in the case first above cited, said: "Now, a vein containing the precious metals is by no means always a straight line of uniform dip, or thickness, or richness of mineral matter throughout its course. Generally the veins are found in what, when the mineral is taken out of them, constitute clefts or fissures in the surrounding rock, with a well-defined wall above and below of different kinds of rock, as porphyry on one side, above or below, and limestone on the other. So long as these inclosing walls can be distinctly and continuously traced and the mineral matter of the same

character found between them, there can be no doubt that it is the same vein. But sometimes the cleft between the inclosing rocks, called in mining parlance the country rock, diminishes so as to be scarcely perceptible. Sometimes for a short distance the fissure disappears entirely and again is found distinctly to exist a little further on. Again it is seen that, though the underlying and superposing country rock is there, the mineral deposit ceases to be found, but, following the fissure, it reappears again very soon. It also happens that both fissure and mineral come to an 'end, and are found no more in that direction, or, if found, so far off or so deflected from the original line as to constitute no part of that vein. Of course, it is sometimes easy to see that it is the same vein all through. It is also easy to see, in some instances, that the vein is run out,— is ended." The court there sustain the following instruction given to the jury by the trial judge: "With well-defined boundaries, very slight evidence of ore within such boundaries will prove the existence of a lode. Such boundaries constitute a fissure, and if in such fissure ore is found, although at considerable intervals and in small quantities, it is called a lode."

In the present case it appears by the testimony of John Dixon and the defendant *John Anthony* that at a point about 100 feet west of the second shaft beyond the stone fence the crevice pinched out; that is, the walls thereof came nearly together. As the latter witness expressed it, "they barred up very narrow to a seam." The owners of the range thereupon sunk another shaft to the westward, in the general direction of the range, hoping to strike the lost crevice. The circuit judge found that this shaft was forty-five feet ahead of the place where the work had stopped. The evidence does not clearly show the location of such shaft, but it was probably not many yards west or southwest of the point where the crevice had pinched out.

From this shaft a drift was made in the same general direction, and finally a crevice was struck in which mineral was again found. It does not satisfactorily appear how far this drift was run before the crevice was struck, nor how far the latter point is from the point where the crevice pinched out. The fair inference from all the testimony, however, is that it could not have been more than a few rods. The parties working the range, especially John Dixon, who had the principal direction of the work, supposed that they had found the original crevice, and none of them seem to have thought they had found a new vein of mineral. Dixon uniformly speaks of the last-alleged discovery as "striking up the diggings again," and says that he expressed the opinion, when they came to the obstruction, that the vein was "split up," and he was determined to explore further for it. The idea of a new discovery seems first to have taken shape on the trial in the circuit court. So far as the testimony shows, the crevice, before it reached the barrier, and after the barrier was passed, was of the same general character — no change in the rock, or in general direction of the crevice, is indicated. Besides, the mineral found on both sides of the barrier was alike.

The above considerations have impelled our minds to the conclusion that, within the definition of a lode or vein above given, the crevice east of the barrier which cut the same off, and that discovered west of the barrier, which extends to the 300-yards limit, is one and the same crevice or range, and that the finding of the mineral therein west of the barrier is not in any correct sense a new discovery.

It follows from the foregoing views that the plaintiff is entitled to judgment.

*By the Court.*— The judgment of the circuit court is reversed, and the cause will be remanded with directions to that court to give judgment for the plaintiff granting a perpetual injunction as prayed, and awarding him compensa-

tion for the mineral taken by the defendants from the crevice west of the 300-yards point and appropriated to their own use.

A motion for a rehearing was denied March 12, 1889.